UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

IN RE:
ENVIRONMENTAL TECHNOLOGIES
INTERNATIONAL, INC.,

        Debtor.
_____/

MATTHEW J. FREESE,

        Appellant,

v.                              Case No. 8:17-cv-74-T-33
                                Bankr. No. 8:15-bk-6910-KRM
                                Adversary No. 8:15-ap-786-KRM

ASA W. CANDLER, III, et al.,

        Appellees.
_____/

## ORDER

This appeal arises from a Chapter 7 adversary proceeding. Appellant Matthew J. Freese filed his initial brief on March 29, 2017. (Doc. # 10). Appellees Asa W. Candler, III and Steve Ostermann filed their response brief on May 15, 2017. (Doc. # 13). Freese filed his reply brief on May 30, 2017. (Doc. # 14). After careful review, this Court affirms.

## I.    Background

Environmental Technologies International, Inc., was founded by David Barnhardt and David S. Gordon in 2000. (Doc.

# 2-16 at 1). In 2005-2006, Tommy Hale introduced Barnhardt to the idea of using magnets to clean oil wells, thus beginning ETI's venture into the oil and gas industry. (<u>Id.</u> at 2). ETI produced a device known as the "Radial Flux Generator," which was meant to "condition in-well crude oil fluids by assisting these fluids to flow with less resistance thus enabling more production." (Doc. # 2-16 at 2; Doc. # 2-19 at 2).

Barnhardt was diagnosed with cancer and, "[d]uring the last months of his life, Barnhardt attempted to locate a successor to serve as the CEO of ETI." (Doc. # 2-16 at 2). Having been approached by Barnhardt to see if he was interested in becoming CEO, Freese became president and CEO of ETI on March 11, 2010. (<u>Id.</u>; Doc. # 2-10; Doc. # 2-16 at 2; Doc. # 2-19 at 2).

The terms and conditions of Freese's employment with ETI were memorialized in an Employment and Management Agreement. (Doc. # 2-10). In relevant part, the Employment and Management Agreement stated:

> **2. Term**. This Agreement . . . shall terminate as of . . .:
>
> . . .
>
>     (c) sixty (60) days after notice is given by one party to the other after a material breach of

this Agreement . . . and the breach is not cured. A material breach by Freese of this Agreement is any significant failure on his part to comply with his obligations under Sections 4, 5,6,7,8,9 [sic] or 10 below. . . .

**3. Compensation**. During the term of this Agreement . . ., Freese shall receive:

(a) **Salary**. [ETI] shall pay Freese, contingent on his securing adequate funding for [ETI], a base salary . . . .

. . . .

(f) **Royalty.**

(i) Freese . . . shall receive a two (2) percent royalty on all gross sales . . . .

. . . .

(i) **Freese acknowledges and agrees that as of the date hereof, [ETI] has no funds with which to pay salary, benefits or expenses, that [ETI] is relying on him to raise the funding necessary for the development and operation of [ETI], and that it is his sole responsibility to develop adequate capital, loans, grants and other sources of funding whereby [ETI] may carry out its operations . . . .**

. . . .

9. **Inventions**. Freese hereby sells, transfers, and assigns to [ETI], all of the right, title, and interest of Freese in and to all inventions, ideas, disclosures, and improvements . . . made or conceived by Freese, solely or jointly, or in whole or in part, during the term hereof which:

(a) relate to methods, apparatus, designs, products, processes, or devices sold, leased, used, or under construction or development by [ETI] . . .; or

(b) otherwise relate to or pertain to the business, functions, or operations of [ETI] . . .; or

(c) arise in whole or in part from the efforts of Freese during the term hereof.

Freese shall communicate promptly and disclose to [ETI] . . . all information . . . pertaining to the aforementioned inventions, ideas, disclosures, and improvements; and . . . Freese shall execute and deliver to [ETI] such formal transfers and assignments and such other papers and documents as may be required of him to permit [ETI] . . . to file and prosecute the patent applications . . . .

(Doc. # 2-10) (bolding in original).

Before Freese signed the Employment and Management Agreement, he had begun meeting with Candler and Ostermann in an attempt to secure funding from Candler Capital Partners, which "is in the business of providing start-up or venture capital to businesses or developers" and also "provides management and operational services for . . . companies." (Doc. # 2-19 at 2; Doc. # 2-9 at ¶ 1(b)). After Freese signed the Employment and Management Agreement he negotiated the terms of Candler Capital's investment in ETI. (Doc. # 2-16 at 2).

The relationship between ETI and Candler Capital was set forth in the Letter Agreement. (Id.; Doc. # 2-9). The Letter Agreement stated:

(a) <u>Exclusive Right to Fund</u>. CCP shall have the exclusive right to provide debt and equity financing to ETI . . . .

. . . .

(e) <u>Security</u>. The Initial Loan shall be secured by:

. . .

ii. All of ETI's right, title and interest in the Proprietary Technology.

. . . .

(f) <u>Security</u>.

i. <u>Security for First Draw</u>. The First Draw shall be secured by (x) shares representing, in the aggregate, fifty-one (51%) of the total number of Authorized Shares . . .; and (y) by all of ETI's right, title and interest in and to the Proprietary Technology.

ii. <u>Security for Funding Balance</u>. The Funding Balance shall be secured by (x) shares representing, in the aggregate, fifty-one (51%) of the total number of Authorized Shares . . .; and (y) by all of ETI's right, title and interest in and to the Proprietary Technology.

. . . .

(h) <u>Board of Directors Representation</u>. Upon Funding of the First Draw, (x) CCP shall be entitled to two (2) seats on ETI's Board of Directors . . . which two (2) seats shall be occupied by Asa W. Candler and Stephen J. Ostermann . . ., and (y) the Board of Directors shall be comprised of no more than six (6) persons. Each person serving on the Board of Directors shall be entitled to one (1) vote, except for Asa W. Candler and Stephen J. Ostermann, who shall each be entitled to one and a half (1.5) votes until such

time as that of all outstanding principal and
accrued interest on the Initial Loan and Project
Loan are repaid in full. . . . [A]s a condition
precedent for the Funding of the First Draw, ETI
shall amend its corporate bylaws to provide that
the number of directors constituting the Board of
Directors shall not exceed six (6) . . . .

. . . .

    5. Due Diligence

. . . .

        (c) Phase II Due Diligence. CCP's "Phase
II Due Diligence" shall include, without
limitation, a review of the results and performance
of the Proprietary Technology in three (3) well
tests conducted over the period of May 1, 2010
through August 31, 2010.

(Doc. # 2-9 at 1-7). The term Proprietary Technology is

defined as "the ETI Radial Flux Generator System ('RFG') and

associated and related intellectual property, trade secrets,

know-how, technologies and products . . . ." (Id. at ¶ 1(a)).

    The Letter Agreement also set forth two conditions

precedent, one of which amended the Employment and Management

Agreement. (Id. at ¶ 6). In particular,

    until such time as that of all outstanding
    principal and accrued interest on the Initial Loan
    and Project Loan are repaid in full:

        i. Freese shall be entitled to the
    annual increase in base salary . . . only if ETI
    performs in accordance with the Pro Forma attached
    hereto . . .;

> ii. Section 3(e) . . . shall apply
> only in the event of a Sale of ETI for an
> aggregate purchase price in excess of ten
> million dollars ($10,000,000); and
>
> iii. The two percent (2%) royalty to
> Freese . . . shall accrue but not be paid
> until such time as CCP is repaid all
> Financing principal and interest . . . .

(Id.). Candler Capital was also "responsible for maintaining the accounting books and records for" ETI with the start of the Initial Loan. (Id. at ¶ 10).

Business proceeded and Freese secured the necessary third-party validation for ETI to complete its patent application. (Doc. # 2-19 at 4). Freese also attended several Candler Capital events in March and April of 2010. (Id.). During one such event, Freese traveled to Connecticut with Candler to meet Fred Mancheski, Don Whelley, and an unnamed person, who were all potential investors. (Id.).

Tensions soon flared when, on July 26, 2010, Candler sent a chastising email to Freese regarding a letter Freese sent to the potential investors. The July 26, 2010, email read, in part:

> You came to Candler Capital because of our
> experience in dealing and negotiating with outside
> investors. . . . We threw down the gauntlet
> yesterday with Fred and Don . . . . You may have
> just handed control of negotiations back to them.

> We appreciate your enthusiasm for ETI's product;
> however, your letter delivered the wrong message.
> We think that by reiterating, ad nauseam, all the
> benefits of the product before you got to the point
> of the message, you told them that you and Tommy
> were desperate for their money.
>
> We wanted them to firmly believe that ETI doesn't
> need them or their money, in order to get them to
> invest *without having control* of the company. To
> re-convince them of this fact will now be more
> difficult. So please do not communicate with them
> what-so-ever. . . .
>
> Since we need your leadership and Tommy's technical
> expertise moving the company forward, and since we
> do not in fact need Don or Fred's money, please
> totally devote your limited time to the business of
> the company and let us handle the money end.

(Doc. # 2-19 at 30-31) (emphasis in original).

In early 2010, ETI did not have or know of a proven housing design for its Radial Flux Generator. (Id. at 3). So, ETI began testing its own housing designs. At first, ETI attempted to use stainless steel, but that failed. (Id. at 5). ETI went back to the drawing board and decided to try "a very expensive and very high performance high temperature resistive epoxy resin over a high impact high wear Kevlar wrap." (Id.). In early 2011, the Radial Flux Generator with the new epoxy coating was installed in a test well. (Id. at 6). The new epoxy housing "completely failed" and caused about $35,000 of damage to the test well. (Id.).

The Letter Agreement was amended in early 2011. (Doc. # 2-9 at 14-16). The 2011 amendment occurred, in part, because ETI had not completed the well tests by the deadline set forth in the original Letter Agreement and ETI needed more money, which Candler Capital was willing to provide. (Id. at 14). The Amended Agreement read:

> 3. Section 5(c) of the Letter Agreement is hereby amended to read as follows in its entirety:
>
>> CCP's "Phase II Due Diligence" shall include . . . a review by CCP of the results and performance of the Proprietary Technology in three (3) well tests conducted by no later than March 1, 2011. At least one (1) of the three (3) well tests shall be performed on the final commercial product.
>
> 4. Section 6(c) of the Letter Agreement is hereby amended to read as follows in its entirety:
>
>> For Funding Balance of Project Loan. Funding by CCP of the Funding Balance of the Project Loan, or any portion or part thereof, shall be at the sole discretion of CCP.

(Id. at 15-16).

Freese then turned to Robbins & Myers, an engineering company, in an attempt to use "sucker rod guide" material as a housing agent. (Doc. # 2-19 at 3). That venture led to Freese and Hale meeting Jonathan Martin, then an "intern engineer" with Robbins & Myers. (Id.). Robbins & Myers successfully completed the coating process and the Radial

Flux Generator was again put in a test well. (Id. at 6-7). The test well failed "for mechanical reasons not related to the" Radial Flux Generator, but ETI was able to gather enough data to show that the Robbins & Myers material was a viable housing agent. (Id. at 7). In light of this partial success, Ostermann insisted that Freese move forward with three simultaneous in-well tests; Freese resisted but ultimately went forward with one test, which was deemed a success in "late summer[/]early fall 2011." (Id.). After the first full-run test was successful, Freese started two more test wells. (Id.). All three tests were producing positive results, but "it was very obvious the RFG rod guide coating was . . . not a long-term marketable solution." (Id.).

Then, on June 8, 2011, Freese and Hale meet Martin for dinner. (Id.). Martin had left his job at Robbins & Myers and, after dinner, showed Freese and Hale a "Box-Guide concept he was working on." (Id.). Thinking Martin's material could be used as a long-term housing agent for the Radial Flux Generator, Freese lobbied ETI to hire Martin. (Id. at 8). Those efforts were successful and sometime in September of 2011, Martin began working full-time for ETI, with ETI gaining the exclusive rights to Martin's polymer material. (Id.).

The year wore on and "[l]ate in 2011, [Robbins & Myers] was making claims that [it] was actually the inventor of the [Radial Flux Generator] magnet covering." (Id. at 16). These "[Robbins & Myers] hiccups" led to resistance by Candler Capital in funding Martin. (Id. at 49). "[S]everal weeks prior to the December 19, 2011 Board of Director[s] meeting, Candler and Ostermann informed [Freese] they wanted to tear up [his] existing Employment and Management Agreement," on the grounds that the royalty obligation might prevent a future joint venture; Freese refused. (Id. at 8). Freese, who had up to this point been "deferring, on [his] own, [his] full contract salary," told Candler and Ostermann that beginning in 2012 he would no longer be deferring his salary. (Id.).

During the December 19, 2011, Board of Directors meeting, Ostermann "expressed to the board his concerns about the absence of any sales or revenue generating leases from the RFG's." (Id. at 9); see also (Doc. # 2-16 at 3). "Ostermann further expressed his concerns about ETI's cash burn rate and the necessity to expedite a path toward sales as timely as possible." (Doc. # 2-19 at 9). For his part, Freese showed the directors Radial Flux Generators that had been removed from a test well due to excessive wear. (Id.). According to Freese's declaration, Ostermann unsuccessfully

attempted to include within the minutes of the meeting false information concerning the market readiness of the Radial Flux Generator. (Id. at 9-10).

With no market-ready product, ETI turned to a newer version of the Radial Flux Generator that was shorter in length and would be coated in Martin's polymer. (Id. at 9-10). Well past the March 1, 2011, amended Phase II Due Diligence deadline set by the Amended Agreement (Doc. # 2-9 at 15), Freese was directed by Candler and Ostermann to do everything possible to have the shortened Radial Flux Generator ready for testing within two months. (Doc. # 2-19 at 10).

A dispute then arose between Freese on the one hand and Candler and Ostermann on the other as to Freese's January of 2012 invoice. (Id. at 11). Even though Candler and Ostermann refused to pay Freese, Freese nevertheless continued working for ETI. (Id.).

A few months later, on April 3, 2012, Candler penned a letter to Martin. (Id. at 41). In this letter, Candler relayed his gratitude for all of Martin's hard work and told Martin that he and Ostermann considered Martin to be the key player (Id.), because Martin was the inventor of the Box Guide technology, which included the polymer material that served

as the only successful long-term housing material for the Radial Flux Generator (Doc. # 2-16 at 4). The letter further stated Martin had the full "confidence, backing, and support" of Candler and Ostermann. (Doc. # 2-19 at 41).

That same month, Candler and Ostermann set up a secret meeting with Martin. (Id. at 12). Martin surreptitiously recorded the meeting and shared the recording with Freese. (Id.; Doc. # 2-16 at 4). During this meeting, Candler and Ostermann expressed their opinion of Freese; in short, Freese was "not the guy [Candler and Ostermann] want[ed] running a billion dollar company." (Doc. # 2-19 at 12). Five days after the meeting, Martin sent an email to Candler and Ostermann (Id. at 12, 47-49). In his April 25, 2012, email, Martin expressed his opinion on a litany of topics, including: that ETI "needed" Freese; that the attempt to "push [Freese] out need[ed] to stop" as it was "stupid"; that Candler Capital was holding up progress; and that Candler Capital was a "common denominator" in the problems facing Freese and Martin. (Id. at 49).

On May 4, 2012, Martin and Freese pulled the results from one of the test wells. (Id. at 13). The Radial Flux Generators showed minimal wear and the Box Guides showed no signs of wear; the "test was an overwhelming success." (Id.).

According to Freese, this success "entitled [Martin] to a $100,000 progress . . . payment." (Id.). Candler and Ostermann, however, attempted to delay payment and "[f]rom that date forward, [they] consistently paid vendors and suppliers late[,] including Martin and [Freese]." (Id. at 14).

At the next month's Board of Directors meeting, held on June 29, 2012, Freese "opened up the meeting" by telling the Board about the secret meeting between Martin, Candler, and Ostermann. (Id. at 14). Freese even read some of his notes of Martin's secret recording to the Board. (Id. at 14-15, 59). Hale and Freese attempted to have Freese's notes entered into the minutes for the meeting, but Candler, Ostermann, and Gordon refused to add them. (Id. at 15).

Shortly thereafter, Candler Capital sent Freese, Hale, Gordon, and Gerald Bertoldo (another director on ETI's Board) an email titled "Proposed Next Steps ETI – CCP." (Doc. # 2-16 at 5). Candler Capital proposed a second amendment to the Letter Agreement, which would have extended the deadline for ETI to make its next installment payment and would have advanced an extra $200,000 to ETI so ETI could close a deal. (Id.). Negotiations on the proposed second amendment continued from July 13, 2012, to August 31, 2012. (Id. at 6).

Ultimately, however, the parties could not agree to terms and ETI voted to reject the proposed second amendment. (Id.; Doc. # 2-19 at 63-68; Doc. # 2-17 at 5).

While negotiations were still ongoing with respect to the proposed second amendment, Martin "claimed for the first time that the mold-on-rod-guide using the high performance polymer was his idea" alone. (Doc. # 2-19 at 16, at 64-68). Martin also indicated in his emails sent on August 6, 2012, that he did not know, nor did he want to know, all the details regarding ETI's financing. (Id. at 64). Nevertheless, until he was paid what he thought was due to him, Martin would be holding onto all intellectual property he had. (Id. at 66).

Candler Capital declared ETI in default under the Amended Agreement on September 7, 2012. (Doc. # 2-16 at 6). As a result, Candler Capital became the majority shareholder of ETI. (Id.; Doc. 2-9). A special meeting of the Board of Directors was called by Candler Capital, which was held on September 25, 2012. (Doc. # 2-16 at 6). At this special meeting, two resolutions were passed by ETI's shareholders. The first resolution, among other things, reduced the number of directors from six to four, dismissed Bertoldo and Hale as directors, named Candler chairman of the Board, and required Freese to "execute and deliver to the Chairman of the Board

of Directors and to the Shareholders, by no later than Friday, September 28, 2012, an original, notarized copy of" the Acknowledgment of Assignment. (Doc. # 2-17 at 1-3). The second resolution acknowledged ETI's default under the Amended Agreement, and surrendered and transferred all of its right, title, and interest in all of the pledged collateral to Candler Capital. (Id. at 6).

Another special Board of Directors meeting was called on October 2, 2012. This special meeting resulted in a resolution that (1) listed out seven breaches by Freese; (2) provided Freese with 60-days' notice of his material breaches; (3) removed Freese from the Board of Directors; and (4) offered Freese a severance agreement. (Id. at 7-8). One of the seven listed breaches included:

> Matthew J. Freese, without authorization or consent by [ETI], identified himself as an inventor of technology belonging to [ETI], and has refused to sign [the] Acknowledgment of Assignment as required by [the] Special Meeting of Shareholders on September 25, 2012, in material breach of Section 9 of the Employment and Management Agreement between him and [ETI], dated as of March 11, 2010.

(Id. at 7). Freese was terminated as CEO and president of ETI on October 10, 2012, for the reasons listed in the October 2, 2012, Board of Directors resolution and, additionally, on the ground that he "transmitted . . . communications containing

threats to injure the reputation of [ETI] . . . ." (Id. at 16). Freese claims he "did not threaten to harm the company in any way." (Doc. # 2-19 at 24). Rather, he "unexpectedly came across new information about the origin of some of Martin's intellectual property that was transferred to ETI and was fully prepared to exclusively share the document and enlighten the ETI board members only." (Id.).

In a state-court proceeding, Freese brought claims for tortious interference against Candler, Ostermann, Tyler Korn (Candler Capital's attorney), Gordon, and Martin. (Doc. # 2-7). But prior to that state-court proceeding, ETI had filed for bankruptcy. On September 2, 2015, Gordon, Candler, and Ostermann removed that state-court proceeding to the bankruptcy court under 28 U.S.C. § 1452. (Doc. # 2-6). So began the underlying adversary proceeding.

Freese voluntarily dismissed the action against Korn and Gordon on March 2, 2016. (Doc. # 2-5 at 12) (entries 41 and 42 on the bankruptcy court's docket). The claim against Martin was dismissed with prejudice on March 3, 2016. (Id.) (entry 43 on the bankruptcy court's docket). Freese appealed, which appeal was assigned case number 8:16-cv-694-T-27; that appeal was dismissed for lack of jurisdiction on May 3, 2016. (Id. at 13, 16) (entries 48, 62 on bankruptcy court's docket). The

adversary proceeding continued and on September 27, 2016, Candler and Ostermann moved for summary judgment on the grounds that they did not act solely with an ulterior purpose. (Doc. # 2-15). Freese responded in opposition (Doc. # 2-18), but the bankruptcy court granted the motion on December 21, 2016. (Doc. # 2-2).

In its order granting summary judgment, the bankruptcy court stated that "the termination of Freese is not tortious interference with his Employment Agreement where his termination is by action of the Board based on valid reasons." (Id. at ¶ 10). The bankruptcy court further stated the Board had two reasons for terminating Freese as CEO and president; namely, an undisputed lack of sales and Freese's violation of the "unambiguous language of Section 9 of the Employment Agreement." (Id. at ¶¶ 11, 12). This appeal followed.

## II. **Jurisdiction**

Freese seeks appellate review of the bankruptcy court's order of "Final Summary Judgment in Favor of Defendants Asa Candler and Steve Ostermann," entered on December 21, 2016. (Doc. # 2-1). This Court has jurisdiction pursuant to 28 U.S.C. § 158(a)(1).

## III. **Standard of Review**

A bankruptcy court's entry of summary judgment is reviewed de novo. In re Optical Techs., Inc., 246 F.3d 1332, 1335 (11th Cir. 2001).

## IV. **Analysis**

### A. **Summary Judgment Standard**

"It is axiomatic that a bankruptcy court deciding a summary judgment motion, just like a district court, must determine whether there are any genuine issues of material fact." Id. at 1334. Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute alone is not enough to defeat a properly pled motion for summary judgment; only the existence of a genuine issue of material fact will preclude a grant of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

An issue is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996). A fact is material if it may affect the outcome of the suit under the governing law. Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997).

The moving party bears the initial burden of showing the court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. Hickson Corp. v. N. Crossarm Co., Inc., 357 F.3d 1256, 1260 (11th Cir. 2004) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). "When a moving party has discharged its burden, the non-moving party must then 'go beyond the pleadings,' and by its own affidavits, or by 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593-94 (11th Cir. 1995) (citing Celotex, 477 U.S. at 324).

If there is a conflict between the parties' allegations or evidence, the non-moving party's evidence is presumed to be true and all reasonable inferences must be drawn in the non-moving party's favor. Shotz v. City of Plantation, Fla., 344 F.3d 1161, 1164 (11th Cir. 2003). If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, the court should not grant summary judgment. Samples ex rel. Samples v. City of Atlanta, 846 F.2d 1328, 1330 (11th Cir. 1988). However, if the non-movant's response consists of nothing "more than a repetition

of his conclusional allegations," summary judgment is not only proper, but required. <u>Morris v. Ross</u>, 663 F.2d 1032, 1034 (11th Cir. 1981).

### B. <u>Tortious Interference</u>

The bankruptcy court granted Appellees' motion for summary judgment on two grounds: an undisputed lack of sales and Freese's violation of Section 9 of his Employment and Management Agreement. (Doc. # 2-2 at ¶¶ 10-12). Freese's sole argument on appeal is that the bankruptcy court impermissibly weighed the record evidence presented at summary judgment to reach its conclusion. (Doc. # 10 at 6). The Court disagrees.

The parties agree Florida law governs. (Doc. # 10 at 26; Doc. # 13 at 9). There are four elements to a claim for tortious interference: "(1) the existence of a business relationship that affords the plaintiff existing or prospective legal rights; (2) the defendant's knowledge of the business relationship; (3) the defendant's intentional and unjustified interference with the relationship; and (4) damage to the plaintiff." <u>Int'l Sales & Serv., Inc. v. Austral Insulated Prods., Inc.</u>, 262 F.3d 1152, 1154 (11th Cir. 2001). Furthermore, "[a] tortious interference cause of action exists only against third parties who are not parties to the business relationship." <u>Clifton v. Titusville Ctr. for</u>

Surgical Excellence, LLC, No. 6:15-cv-1604-Orl-37KRS, 2016 WL
233879, at *2 (M.D. Fla. Jan. 20, 2016) (citations omitted).
Stated differently, "[g]iven that corporate entities . . .
must act through individuals, a tortious interference claim
will generally not lie against employees and representatives
of contracting entities." Cox v. CSX Intermodal, Inc., 732
So. 2d 1092, 1099 (Fla. 1st DCA 1999) (citation omitted).

There is, however, an exception. In particular, a non-
stranger's privileged interference "is divested when the
defendant 'acts solely with ulterior purposes and the advice
is not in the principal's best interest.'" Alexis v. Ventura,
66 So. 3d 986, 988 (Fla. 3d DCA 2011) (quoting O.E. Smith's,
Inc. v. George, 545 So. 2d 298, 299 (Fla. 1st DCA 1989)). The
phrase "sole ulterior purpose" has been interpreted by
Florida courts to mean "a singular improper purpose
detrimental to the employer's interests." Id.

Here, it is undisputed Candler and Ostermann were
members of ETI's Board of Directors (Doc. # 2-9 at ¶ 4(h))
and are, as such, not considered third-parties to the
Employment and Management Agreement, Cox, Inc., 732 So. 2d at
1099. Freese was therefore required to show Candler and
Ostermann acted with a singular improper purpose detrimental

to ETI's interests in order to prevail on his tortious interference claim. <u>Alexis</u>, 66 So. 3d at 988.

The record contains evidence that Freese violated Section 9 of his Employment and Management Agreement by identifying himself as an inventor of technology belonging to ETI. (Doc. # 2-17 at 7, ¶ 1). Moreover, evidence was presented that Freese failed to comply with the Board's resolution dated September 25, 2012, requiring Freese to execute and deliver to Candler and ETI's shareholders the Acknowledgement of Assignment. (<u>Id.</u>). By failing to comply with the September 25, 2012, resolution, Freese violated Section 9 of his Employment and Management Agreement. (Doc. # 2-10 at 6, 9) ("Freese shall execute and deliver to [ETI] such formal transfers and assignments and such other papers and documents as may be required of him to permit [ETI] . . . to file and prosecute the patent applications"). Freese failed to present any evidence disputing the foregoing breaches.

These undisputed breaches provided Candler and Ostermann as directors of ETI with a legitimate reason for terminating Freese's employment. The undisputed facts show Candler and Ostermann sought to secure ETI's rights to valuable technology and terminated Freese's employment with ETI because of his failure to comply with a Board directive.

Therefore, Freese failed to carry his burden of showing a genuine issue of material fact on the issue of whether Candler and Osterman acted with a sole ulterior purpose.

Accordingly, it is

**ORDERED, ADJUDGED,** and **DECREED:**

(1) The bankruptcy court's order of "Final Summary Judgment in Favor of Defendants Asa Candler and Steve Ostermann," entered on December 21, 2016, is **AFFIRMED.**

(2) The Clerk is directed to transmit a copy of this Order to the bankruptcy court and **CLOSE** this case.

**DONE** and **ORDERED** in Chambers in Tampa, Florida, this 13th day of June, 2017.

VIRGINIA M. HERNANDEZ COVINGTON<br>
UNITED STATES DISTRICT JUDGE